**Zaffiri (Jeffrey) G. MOSCHI**

v.

**S/S EDGAR F. LUCKENBACH et al.**

**No. 6740.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Jan. 21, 1969.

John J. Cummings, III, and Charles Ferrara and Robert G. Heller, co-counsel, New Orleans, La., for respondents.

Healy, Baillie & Burke, New York City, and Phelps, Dunbar, Marks, Claverie & Sims, by James B. Kemp, Jr., New Orleans, La., and Edw. J. Brandao, for defendant.

MITCHELL, District Judge.

Libelant, Zaffiri (Jeffrey) G. Moschi, a seaman, sued the S/S Edgar F. Luckembach *in rem* under the general maritime law for personal injuries allegedly sustained by him while he was a member of her crew due to her unseaworthiness.

The matter came on for trial before this Court, without a jury, on November 21, 1968, and the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

#### I

At all times material hereto, Luckenbach Overseas Corporation was the owner and operator of the S/S Edgar F. Luckenbach, (now the S/S Overseas Edgar) an American flag vessel.

#### II

On and prior to April 8, 1963, libelant, Moschi, was second electrician on the Edgar F. Luckenbach at a salary of $580.72 per month.[1]

#### III

On April 8, 1963, the Edgar F. Luckenbach was docked in the Port of Mobile, Alabama, loading general cargo, having recently returned from a voyage to Alexandria, Egypt.

#### IV

At about 8:00 AM on that day, pursuant to an order by the Chief Engineer, Arthur H. Sebastian, to replace a burned out armature in the No. 2 atmospheric drain pump motor, Moschi proceeded to the engine room. Adjacent thereto was a room-like recess, approximately 7 or 8 feet high and some 10 feet long. Opening off this recess was an alcove about the same height but only some 4 feet wide and 4 or 5 feet deep, with ceiling, flooring and walls of sheet metal. The No. 2 pump was located in this alcove and was mounted on a platform with an overhead clearance of about 4 feet.[2]

In order to replace the armature, the motor had to be lifted approximately 1 foot in the air, over another piece of machinery, and then moved out of the alcove.

Moschi uncoupled the shaft, unbolted the motor and, unassisted, attempted to lift the motor by standing on the platform, in a crouched position, with a strap at the base of his neck extended to one end of the motor and his hands on the other end. After trying to lift the motor for approximately a half hour, to no avail, Moschi finally asked assistance from another crew member who was in the engine room.

---

1. Shipping Articles, Exhibit P–1.

2. Medina deposition, p. 29; Sebastian deposition, pp. 23–27.

Approximately an hour after leaving the engine room, he began to feel pain in his lower left back. The vessel sailed from Mobile that same day and he remained in bed until she docked at New Orleans on April 12, 1963.

## V

Immediately upon leaving the vessel, Moschi sought medical attention at the United States Public Health Service Hospital in New Orleans and was treated, as an outpatient, for lumbar sacral strain until he was discharged as fit for duty on May 17, 1963.

A few weeks later, while mopping his apartment, he heard a pop in his back and again experienced the same low back pain. He returned to the hospital, received an additional 30 days of physical therapy, and resumed work on July 30, 1963.

During the two year period following his discharge, Moschi was a member of the crew of 12 different vessels, doing jobs which, according to him, did not require heavy lifting. He testified that although he worked he was in pain a great deal of that time and had consulted various physicians during that period.

On November 16, 1965, he was examined by Dr. G. Gernon Brown, Jr. who found no objective evidence of injury to the lumbar or lumbosacral spine. On June 6, 1966, Dr. Brown performed a lumbar laminectomy on Moschi, removing a herniated (intervertebral) disc.

## VI

No one was present when Moschi sustained his injury and there is contradictory testimony in the record as to the date and manner in which he was injured, if at all. He testified that his injury occurred on Monday, April 8, 1963, and this is substantiated by a report of personal injury dated April 9, 1963, prepared by Julius Medina, then serving as First Engineer. Medina testified that although the report was dated April 9, 1963, Moschi must have been injured on April 8, 1963, inasmuch as, on the morning of the 9th, he told Medina that he could not report for work because of the pain.[3]

Moschi claims he was injured while attempting to lift the motor from the No. 2 atmospheric drain pump but Taggert, the Chief Electrician, Sebastian, the Chief Engineer and Medina all contend that he told them that he was injured when a cargo winch door fell on him.

Moschi was born in Greece. Although he has lived in the United States for 10 years, he has a heavy accent and is sometimes difficult to understand.[4]

Medina's personal injury report specifically states that Moschi wrenched his back while lifting a motor.[5] In the record of repairs kept by Chief Engineer Sebastian, the index card pertaining to the No. 2 atmospheric drain pump specifically states that the armature in the motor was renewed on April 8, 1963.[6]

By a preponderance of the evidence, the Court finds as a fact that libelant was injured on April 8, 1963, while attempting to lift the motor of the No. 2 atmospheric drain pump.

## VII

The testimony places the weight of the motor at anywhere from 50 to 100 pounds.[7] Moschi contends that two men are needed to lift it, which is corroborated by Taggert.[8] However, both Medina and Sebastian testified that one man could do the job by rigging a block

---

3. Medina deposition, pp. 4, 19; Exhibit P-11.

4. Medina deposition, p. 23; Taggert deposition, p. 27.

5. Medina deposition, p. 43; Exhibit P-11.

6. Exhibit P-2; also, see Sebastian deposition, pp. 13 and 14.

7. Moschi testified the motor weighed 100 pounds; Sebastian testified it weighed 70 to 80 pounds, (see Sebastian deposition, p. 7) and Medina testified it weighed 50 pounds. (See Medina deposition, p. 28.)

8. Taggert deposition, pp. 16, 17, 25.

and tackle or using other available equipment.[9]

Moschi testified that although the vessel had lifting equipment aboard, it was impossible to use it because of the close quarters, or to rig a block and tackle because there were no hooks in the alcove to which to attach them.[10]

■ Because of the location and weight of the motor, the Court finds, by a preponderance of the evidence, that to remove the motor from the alcove was a two man job.

### VIII

The testimony reveals that during her stay in Mobile, the Edgar F. Luckenbach did not have a full crew complement.[11] She normally carried two electricians but, since the chief electrician, Taggert, was in his home port, Moschi was the only electrician aboard at the time of the accident.[12]

The testimony further reveals that the Edgar F. Luckenbach usually carried two wipers, whose duties were to assist the electricians[13] and engineers in the performance of jobs requiring manual labor. At the time of the accident, no wipers were on board and none had reported for duty.

### IX

■ The failure of the respondent to provide libelant with sufficient assistance, specifically, an additional crewman to help libelant perform the required task, i. e., lifting the motor, rendered the S/S Edgar F. Luckenbach unseaworthy in that regard.

### X

Moschi's operation took place three years after the alleged incident aboard the S/S Edgar F. Luckenbach and Dr. G. Gernon F. Brown testified that, although he could not, with medical certainty, relate Moschi's herniated disc to the alleged incident aboard the Edgar F. Luckenbach, particularly after the lapse of so long a period of time between the incident and the laminectomy, it would be reasonable to incriminate the lifting incident.

There is no doubt that Moschi was injured aboard the vessel; both Sebastian[14] and Taggert[15] testified that he was visibly in pain.

Dr. Brown testified that Moschi had a permanent disability to his body in the amount of fifteen (15%) per centum.

### XI

■ The Court finds as a fact that Moschi's injuries were sustained as a proximate result of the aforesaid unseaworthiness of the S/S Edgar F. Luckenbach.

### XII

■ Moschi has sustained special damages of one thousand seven hundred forty-five and 38/100 ($1,745.38) dollars,[16] and damages in the sum of seventeen thousand seven and 12/100 ($17,-007.12) dollars, or total damages in the amount of eighteen thousand seven hundred fifty-two and 50/100 ($18,-752.50) dollars, as a proximate result of the accident suffered by him aboard the S/S Edgar F. Luckenbach on April 8, 1963.

### XIII

The deck log of that vessel[17] clearly reflects that she sailed from Mobile on Monday, April 8, 1963, at 1325 hours. Thus, the crew was returning to the

9. Medina deposition, p. 30; Sebastian deposition, pp. 27, 28.

10. Moschi's testimony.

11. Medina deposition, pp. 6, 7–33.

12. Taggert deposition, pp. 7, 20 et seq.

13. Medina, deposition, p. 30.

14. Sebastian deposition, p. 40.

15. Taggert deposition, pp. 8, 29.

16. Exhibits P–3, P–4 and P–5.

17. Exhibit Luckenbach 9.

vessel. The chief engineer's log [18] shows that during the morning of April 8, 1963, various work was underway in the engine room, so other crew members had to be present there.

Moschi testified that he was an experienced electrician, familiar with the weight of atmospheric pump motors, so he should have foreseen the need to request assistance from a superior officer or another crew member before he began his task.

■ The Court finds as a fact that his negligent failure to request additional help to aid him in his assigned task on April 8, 1963 contributed fifty (50%) per centum to his accident.

## XIV

After deducting for libelant's contributory fault the sum of nine thousand three hundred seventy-six and 25/100 ($9,376.-25) dollars, representing fifty (50%) per centum of his total damages, the total amount recoverable by him from respondent in this suit is the sum of nine thousand three hundred seventy-six and 25/100 ($9,376.25) dollars.

## CONCLUSIONS OF LAW

This court has jurisdiction of this action as an admiralty and maritime claim, and venue is properly laid in the Eastern District of Louisiana.

### I

■ Libelant, Zaffiri (Jeffrey) G. Moschi, as a member of the crew of the S/S Edgar F. Luckenbach, was entitled to the warranty of seaworthiness.[19]

### II

■ The owner of a vessel has an absolute, nondelegable duty to provide a seaworthy ship.[20]

### III

■ Not only must the equipment about a ship be reasonably fit for the purposes for which they are intended and to be used, but the ship must be properly manned. To be inadequately or improperly manned is a classic case of an unseaworthy vessel.[21]

### IV

■ A shipowner is obligated to provide his vessel with an adequate, overall crew and, also, an adequate number of men for each task to be performed on the vessel.[22]

### V

Here, replacing the armature in the No. 2 atmospheric drain pump motor necessitated that the motor be removed and, under the conditions existing aboard the Edgar F. Luckenbach at the time, such was a two man job, dangerous for one man to handle alone. Accordingly, the S/S Edgar F. Luckenbach was improperly manned when libelant attempted to remove the motor without having been furnished adequate assistance.[23]

### VI

The evidence shows that there was at least one other crew member in the engine room while Moschi was attempting to lift the motor and Moschi's failure

18. Exhibit Luckenbach 8.

19. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903).

20. Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944); Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

21. Boudoin v. Lykes Bros. S. S. Co., Inc., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955); June T. Inc. v. King, 290 F.2d 404 (CA 5–1961); Waldron v. Moore McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967).

22. American President Lines, Ltd. v. Redfern, 345 F.2d 629 (CA 9–1955).

23. American President Lines, Ltd. v. Welch, 377 F.2d 501 (CA 9–1967) cert. den. 389 U.S. 940, 88 S.Ct. 294, 19 L.Ed. 2d 290; Waldron v. Moore McCormack Lines, supra.

to request additional help contributed to his resulting injury.[24]

## VII

After deducting the sum of nine thousand three hundred seventy-six and 25/100 ($9,376.25) dollars, which represents fifty (50%) per centum of his total damages, for Moschi's contributory fault, the total amount recoverable by Moschi from the respondent is nine thousand three hundred seventy-six and 25/100 ($9,376.25) dollars.

Let judgment be entered accordingly.

---

24. American President Lines, Ltd. v. Welch, supra.